## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

MARY DAVIS,                          :

    Plaintiff,                   :
                                               Case No. 3:13cv00398
 vs.                                 :
                                               District Judge Walter Herbert Rice
CAROLYN W. COLVIN,                   :   Chief Magistrate Judge Sharon L. Ovington
Acting Commissioner of the Social
Security Administration,             :

    Defendant.                   :

---

## REPORT AND RECOMMENDATIONS[1]

---

### I.    Introduction

Plaintiff Mary Davis filed applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") on May 20, 2009.  (*PageID##* 268-78).  She alleged that she became unable to work beginning June 3, 2005, due to medullary sponge kidney disease and Brugada Syndrome.[2]  (*PageID##* 305, 330).  She later amended her onset date of disability to August 3, 2009.  (*PageID#* 133).

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

[2] Brugada syndrome is a condition that causes a disruption of the heart's normal rhythm. Specifically, this disorder can lead to uncoordinated electrical activity in the heart's lower chambers (ventricles), an abnormality called ventricular arrhythmia. *See* http://ghr.nlm.nih.gov/condition/brugada-syndrome, last visited January 12, 2015.

After various administrative proceedings, Administrative Law Judge ("ALJ") Mary F. Withum denied Plaintiff's applications based on her conclusion that Plaintiff's impairments did not constitute a "disability" within the meaning of the Social Security Act.  (*PageID##* 77-89).  The ALJ found that despite Plaintiff's severe physical impairments, she still had the residual functional capacity ("RFC")[3] to perform a restricted range of sedentary unskilled work and there were a significant number of jobs in the national and regional economy that Plaintiff could perform.  (*PageID#* 82, 87). The ALJ's nondisability determination and the resulting denial of benefits later became the final decision of the Social Security Administration.  (*PageID##* 56-59).  Such final decisions are subject to judicial review, *see* 42 U.S.C. § 405(g), which Plaintiff is now due.

This case is presently before the Court upon Plaintiff's Statement of Errors (Doc. # 9), the Commissioner's Memorandum in Opposition (Doc. #11), Plaintiff's Reply (Doc. #14), the administrative record (Docs. #7, 8), and the record as a whole.

## II.  **Background**

### A.  **Plaintiff's Testimony**

---

[3]The claimant's "residual functional capacity" is an assessment of the most the claimant can do in a work setting despite his or her physical or mental limitations.  20 C.F.R. §404.1545(a); *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002).

Plaintiff was 25 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date.  20 C.F.R. §§ 404.1563, 416.963; *PageID#* 87.[4]  She testified at the administrative hearing held on May 23, 2012 that she was unable to attend the previously scheduled hearing because she was hospitalized during that time after her mother found her passed out.  (*PageID#* 108-09).  Plaintiff was discharged after three days in the hospital.  (*Id.*).  She was told that "it was [her] heart rhythm beating fast and [she] passed out."  (*PageID#* 109).

Plaintiff testified that she last worked as a home healthcare aide for the elderly, until her employment was terminated in 2005.  (*PageID#* 115).  Plaintiff stated that while running an errand for an elderly couple, she passed out and an ambulance was called. (*Id.*).  According to Plaintiff, "the company didn't like that at all . . . and I pretty much lost my job."  (*Id.*).  Plaintiff further stated that the company "pretty much told me I was a liability to not only the clients, but . . . I could hurt myself or hurt one of the clients if I was to pass out . . . ."  (*Id.*).  Although there was some confusion on Plaintiff's part with dates, it appears the last time she worked was actually in 2009 as an aide at an elderly care home.  (*PageID#* 131).  Plaintiff testified she worked there for approximately 1 ½ to 2 years, but was paid as an "independent contractor" and does not have any idea if she filed tax returns during that time period.  (*PageID#* 132).  The ALJ noted there were no

---

[4] Counsel for Plaintiff filed a notice on July 22, 2014 indicating that Plaintiff passed away on June 3, 2014, and attached a copy of her death certificate.  (Doc. #12, *PageID#* 1396).  The death certificate indicated an autopsy was performed but the manner of death was still listed as "Pending Investigation."  (Doc. #12-1, *PageID#* 1397).

records of these earnings. (*Id.*). After this later period of working was discussed during the administrative hearing, Plaintiff amended her onset date of disability from June 3, 2005, to August 3, 2009. (*PageID#* 133).

At the hearing, Plaintiff testified she was living with her two children, age 5 and 21 months. (*Id.*). She stated she supports herself through cash and food assistance benefits. (*PageID#* 110). She no longer drives and does not have a driver's license. (*Id.*). She graduated from high school and completed two years of college. (*PageID#* 111).

Plaintiff testified that as a child she passed out, and suffered from migraines and kidney stones. (*PageID#* 113). Plaintiff stated her parents both get kidney stones "really bad" and she believed it may be hereditary. (*Id.*). In addition, Plaintiff testified that she has problems with getting scared and nervous, then passing out. (*Id.*). She does not take medication for this condition, but had a loop recorder implanted and her cardiologist, Dr. Wenzke, is monitoring it "to see what exactly is going on." (*PageID#* 114). She testified the last time she passed out was about a year ago, around February 2011. (*PageID#* 124). To help prevent kidney stones, Plaintiff drinks a lot of water and avoids caffeine and sodium. (*PageID#* 115). Plaintiff testified she was having kidney stones "a couple times a month" throughout her time working as a healthcare aide and she would miss two to three days if hospitalized for them. (*PageID#* 116).

Plaintiff next testified to severe anxiety with panic attacks, especially in

4

public places.  (*PageID##* 118-19).  When asked about a particular event that would have led to a Post Traumatic Stress Disorder ("PTSD") diagnosis, Plaintiff replied that she had a couple of family members pass away.  (*Id.*).  At the time of the hearing she was not taking any medications for mental health related conditions.  (*PageID#* 119).  Plaintiff also has not had any psychiatric hospitalizations, inpatient care, or emergency room visits with panic attack symptoms.  (*PageID#* 120).

Plaintiff stated that she typically stays in her house and cares for her two sons. (*PageID#* 123).  Her mother comes over often and "helps with basically every – like all the things you would do during the day she helps me with."  (*Id.*).  Plaintiff mostly rests on the couch or in bed most of the day.  (*Id.*).  Plaintiff testified her mother does her laundry and cooks.  (*PageID#* 123-24).  Plaintiff only takes showers because she is scared about passing out while taking a bath.  (*PageID#* 127).

Plaintiff estimated she can walk "a couple [of] blocks," and can "stand probably for a good 15/20/25 minutes and then [she needs] to sit down or lay down."  (*PageID#* 129).  Plaintiff testified she can "somewhat" kneel, crouch, and crawl, but has problems with lifting or sitting up too quickly.  (*PageID#* 129-30).  She cannot lift over a gallon of milk.  (*PageID#* 130-31).  She stated she was not limited in the amount of time she could sit.  (*PageID#* 131).

Plaintiff stated she smokes about two cigarettes a day, but used to smoke about a pack every few days.  (*PageID#* 137).  She has Vicodin or Oxycodone at home to take

whenever she is passing kidney stones.  (*Id.*).  She testified she has not used any illegal

drugs since she was hospitalized in August 2009.  (*PageID#* 138-39).

      **B.**    **Medical Evidence**

The administrative record contains many medical records plus opinions from

Plaintiff's treating and non-treating medical sources.  A detailed description of those

records and opinions is unnecessary because the undersigned has reviewed the entire

administrative record and because both the ALJ and Plaintiff's counsel have accurately

summarized the relevant records concerning Plaintiff's physical and mental impairments

with citations to specific evidence.  The Commissioner likewise defers to the ALJ's

factual recitation.

**III.**    **Administrative Review**

      **A.**    **"Disability" Defined**

To be eligible for SSI or DIB a claimant must be under a "disability" within the

definition of the Social Security Act.  *See* 42 U.S.C. §§ 423(a), (d), 1382c(a).  The

definition of the term "disability" is essentially the same for both DIB and SSI.  *See*

*Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).  Narrowed to its statutory

meaning, a "disability" includes only physical or mental impairments that are both

"medically determinable" and severe enough to prevent the applicant from (1) performing

his or her past job and (2) engaging in "substantial gainful activity" that is available in the

regional or national economies.  *See Bowen*, 476 U.S. at 469-70 (1986).

A DIB/SSI applicant bears the ultimate burden of establishing that he or she is under a disability. *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

### B.      Social Security Regulations

Administrative regulations require ALJs to resolve a disability claim through a five-Step sequential evaluation of the evidence. *See PageID## 77-79*; *see also* 20 C.F.R. § 416.920(a)(4). Although a dispositive finding at any Step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.      Is the claimant engaged in substantial gainful activity?

2.      Does the claimant suffer from one or more severe impairments?

3.      Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. 404, Subpart P, Appendix 1?

4.      Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

5.      Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 416.920(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

### C.      ALJ Withum's Decision

At Step 1 of the sequential evaluation, the ALJ found that Plaintiff has not engaged in substantial gainful activity since August 3, 2009.  (*PageID#* 79).

At Step 2 of the sequential evaluation, ALJ Withum concluded that Plaintiff has the following severe impairments: spina bifida oculta, supraventicular tachycardia, syncope, medullary sponge kidney with kidney stones, migraines, major depressive disorder, panic disorder with agoraphobia, post traumatic stress disorder, dissociative disorder, avoidant personality disorder and opiate dependence.  (*PageID#* 79).

The ALJ concluded at Step 3 that Plaintiff did not have an impairment or combination of impairments that met or equaled one of the Listings, including sections 1.04, 4.05, 6.02, 6.06, 12.04, 12.06, 12.07 and 12.08.  (*PageID##* 80-82).

At Step 4, the ALJ evaluated Plaintiff's RFC and found the following:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a).  She cannot climb ladders, ropes or scaffolds and can only occasionally climb ramps or stairs, balance, crouch, stoop, kneel or crawl. The claimant can only perform 1-2 step tasks in an environment free of fast-paced production requirements.  Her work must be low stress, with only occasional decision making required and only occasional changes in the work setting.  Lastly, the claimant can only occasionally interact with the public, coworkers and supervisors.

(*PageID#* 82).  The ALJ further determined that Plaintiff's statements concerning her impairments and their impact on her ability to work are inconsistent with the record as a whole and not entirely credible.  (*PageID#* 85).  The ALJ found Plaintiff could not perform her past relevant work as a home health aide, performed at, and typically requiring, medium exertional level.  (*PageID#* 87).

8

At Step 5, based on the testimony of the VE, the ALJ concluded that – considering Plaintiffs's age, education, work experience, and RFC – she is capable of making a successful adjustment to other work that exists in significant numbers in the national economy, such as the occupations of charge account clerk, tube operator, and microfilm document preparer.  (*PageID#* 88).

This assessment, along with the ALJ's findings throughout her sequential evaluation, led her to ultimately conclude that Plaintiff was not under a disability and therefore not eligible for DIB or SSI.  (*Id.*).

## IV.  <u>Judicial Review</u>

Judicial review of an ALJ's decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings.  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999).  Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)).  Substantial evidence consists of

"more than a scintilla of evidence but less than a preponderance . . ." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry, reviewing for correctness the ALJ's legal criteria, may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## V.    Discussion

### A.    Physical Impairments and the Weight assigned to Dr. Wenzke

Plaintiff contends that although the ALJ properly rejected the opinions of the nontreating physicians (Drs. Bolz and Klyop), the ALJ erred by rejecting the opinion of her treating cardiologist, Dr. Stephen Wenzke. Plaintiff maintains that the ALJ's decision was not based on any medical opinion and was flawed because the ALJ assumed the role of a medical doctor. (Doc. 9, *PageID##* 1370-73).

The Commissioner argues that the ALJ properly weighed the medical opinions related to Plaintiff's physical impairments and the RFC determination is well supported by substantial evidence. (Doc. 11, *PageID##* 1387-93).

Social security regulations recognize several different categories of medical sources: treating physicians, nontreating yet examining physicians, and nontreating yet record-reviewing physicians. *Gayheart v. Comm'r Social Sec.*, 710 F.3d 365, 375 (6th Cir. 2013).

> As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a "nonexamining source"), and an opinion from a medical source who regularly treats the claimant (a "treating source") is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a "nontreating source").  In other words, "[t]he regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." Soc. Sec. Rul. No. 96–6p, 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996).

*Gayheart*, 710 F.3d at 375 (citing 20 C.F.R. §§ 404.1502, 404.1527(c)(1), (d) (eff. April 1, 2012)).

A treating source's opinion may be given controlling weight under the treating physician rule only if it is both well supported by medically acceptable data and not inconsistent with other substantial evidence of record. *Gayheart*, 710 F.3d at 376; *see* 20 C.F.R. §404.1527(d)(2) (eff. April 1, 2011).  "If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence."  *Gayheart*, 710 F.3d at 376 (citing 20 C.F.R. § 404.1527(c)(2)-(6) (eff. April 1, 2012).

11

Unlike treating physicians, "opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.' The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling. Other facts 'which tend to support or contradict the opinion' may be considered in assessing any type of medical opinion." *Id*. (citing 20 C.F.R. §404.1527(c)(6) (eff. April 1, 2012)).

Turning to Dr. Wenzke's opinions, he first began treating Plaintiff on August 17, 2009, following her hospitalization earlier that month over concerns about syncope and an abnormal EKG. (*PageID##* 409-10, 951). A few months after first treating her, Dr. Wenzke wrote a letter addressed "To Whom it May Concern," indicating that Plaintiff should not drive an automobile "[g]iven [her] syncopal episode" and that "[i]t is also difficult for [her] to be employed because syncope may require her to assume a sitting or supine position immediately in order to resolve her symptoms . . . ." (*PageID#* 949). Dr. Wenzke opined, "as such she is not able to actually perform routine employment." (*Id.*). He also recommended that she not lift more than five pounds due to the risk of harm should Plaintiff have a syncopal episode. (*Id.*). The record also contains a copy of the same later dated March 9, 2012. (*PageID#* 1321).

Approximately 4 months later, on March 4, 2010, Plaintiff was again seen by Dr. Wenzke. At this time, Dr. Wenzke noted that Plaintiff had two syncope episodes where she reportedly lost consciousness since having a loop recorder implanted: "She went to

12

the emergency room on one occasion in January of this year [2010].  Another episode was

associated with altered mental status more so than frank syncope and she did not seek

medical attention."  (*PageID#* 947).  He further noted the following:

> I analyzed her loop recorder today.  The patient had three episodes where she
> reported symptoms and transmitted events that were associated with sinus rhythm
> and no significant rhythm disturbances.  The episodes included two episodes from
> October and November where she had altered mental status.  The episode in
> question in January took her to the emergency room and was associated again with
> a normal sinus rhythm with a rate of about 90-100 per minute.
>
> Otherwise, the patient has had periods of sinus tachycardia that have been
> detected, but no other significant pathologic rhythm disturbances appear to be
> present.
>
> The issues were discussed at length with the patient today.  Again I do not find
> findings that are consistent with Brugada's syndrome.  Her most [recent] episode
> of syncope was not associated with any significant rhythm disturbance.  Her
> resting EKG today remains unremarkable.  Her recent noninvasive workup a
> number of months ago showed a normal perfusion study and a normal
> echocardiogram.  We will continue to monitor for her symptoms and she will
> return for followup assessment in the near future.

After a followup visit a few months later in June 2010 to assess her cardiac status while

pregnant, Dr. Wenzke wrote that Plaintiff was originally referred to his office in August

2009, with a history of syncope and some concerns regarding Brugada's syndrome.  Dr.

Wenzke noted that since then, and upon review of the EKGs, he "was not convinced that

the patient had [Brugada's] syndrome.  Her noninvasive workup, which as included a

stress test as well as an echocardiogram, had been normal."  (*PageID#* 946).  As to the

loop recorder that had been implanted, Dr. Wenzke noted that during the syncopal

episodes earlier this year, Plaintiff's rhythm was normal: "We did an analysis of her loop

13

recorder at the last office visit, which appeared stable." (*Id.*).  Dr. Wenzke performed

another analysis of Plaintiff's loop recorder during the June 2010 office visit and found

"no significant arrhythmic events have occurred in spite of her symptoms of near syncope

in the last several weeks." (*Id.*).  According to Dr. Wenzke:

> Mary seems stable at this point.  We do not have a good explanation for her
> syncope in the past, but I do not think it is likely that this is related to Brugada
> syndrome at this point based on the absence of any significant rhythm findings on
> her loop recorder with her symptoms.  I am optimistic that the patient will have an
> uneventful cardiac course during her pregnancy.

(*Id.*).  ALJ Withum gave partial weight to Dr. Wenzke's opinion.  (*PageID#* 86).  She

restricted Plaintiff to sedentary work, noting that such a restriction would accommodate

Dr. Wenzke's statement that sitting down would be sufficient to relieve Plaintiff's

symptoms,[5] but did not include the 5 lb. weight restriction Dr. Wenzke recommended.

(*Id.*)  Rather, the ALJ found such a restriction to be "rather arbitrary" and, from a

vocational standpoint, "not significantly different from a 10 lb. restriction."[6]  (*Id.*).  A

review of the record indicates the ALJ's findings to be supported by substantial evidence.

For example, the ALJ did not simply deem the difference between a 5 lb. restriction and a

10 lb. restriction to be "not significantly different" based on her own opinion, rather she

relied upon the testimony from a vocational expert.  (*PageID#* 144).  When asked by the

ALJ if a "limitation to not lifting more than five pounds, either frequently or occasionally,

---

[5] Plaintiff testified at the administrative hearing in March 2012 that she could stand "for a good
15/20/25 minutes" before needing to sit down.  (*PageID#* 129).

[6] As to lifting, "sedentary work" involves lifting no more than 10 pounds at a time, including
objects like docket files, ledgers, and small tools.  20 C.F.R. § 404.1567(a).

would . . . impact [the number of] sedentary job[s]," the VE stated, "[n]o, I don't think it would." (*Id.*).  Likewise, Dr. Wenzke did not explain how he arrived at a 5 lb. restriction or otherwise provided any meaningful discussion regarding the weight limitation.  Even assuming the ALJ should have included the 5 lb. weight restriction recommended by Dr. Wenzke, Plaintiff nevertheless has failed to articulate how it would have precluded sedentary work in light of the VE's testimony.  In any event, the assessment of Plaintiff's RFC does not need to mirror the opinion of any medical source.  *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009)("Although the ALJ may not substitute his opinion for that of a physician, he is not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding.").

It is also important to note that Dr. Wenzke does not specifically state that Plaintiff is unemployable, but rather that it would be "difficult for [her] to be employed," and she would not be able to do "routine employment."  (*PageID#* 949).  Thus, while such language certainly suggests that Dr. Wenzke believed Plaintiff would require a number of accommodations if employed, it does not likewise clearly indicate that he deemed her to be completely unemployable.  Regardless, opinions on some issues, such as whether the claimant is disabled and the claimant's RFC, "are not medical opinions, . . . but are, instead, opinions on issue reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., they would direct the determination or decision of disability."  20 C.F.R. § 404.1527(e).

For these reasons, the Court finds the ALJ did not err in providing only partial weight to the opinion of Dr. Wenzke when assessing Plaintiff's RFC.  (*PageID#* 82).

**B.**     **Mental Impairments and the Weight assigned to Dr. Kramer**

During the sequential analysis, the ALJ determined Plaintiff's Mental Residual Functional Capacity ("MRFC").  20 C.F.R. §§ 416.920(a)(4), 416.945.  Here, the ALJ found Plaintiff could perform a range of work that accommodated a variety of mental limits.  (*PageID#* 82).  According to the ALJ, Plaintiff can perform 1-2 step tasks in an environment free of fast-paced production requirements.  Her work must be low stress, with only occasional decision making required and only occasional changes in the work setting; and she can only occasionally interact with the public, coworkers and supervisors. (*Id.*).  As explained in her decision, in formulating Plaintiff's functional capacity assessment, the ALJ considered the opinions and findings of the examining and reviewing medical sources, as well as other evidence of Plaintiff's activities and treatment. (*PageID##* 82-87).

The Social Security regulations, rulings, and Sixth Circuit precedent provide that the ALJ is charged with the final responsibility in determining a claimant's residual functional capacity.  *See e.g.,* 20 C.F.R. § 404.1527(d)(2) (the final responsibility for deciding the residual functional capacity "is reserved to the Commissioner.").  Moreover, the Social Security Act and agency regulations require an ALJ to determine a claimant's residual functional capacity based on the evidence as a whole.  42 U.S.C. § 423(d)(5)(B),

1382c(a)(3)(H)(i)(incorporating § 423(d) for Title XVI); 20 C.F.R. § 404.1545(a) ("the

ALJ . . . is responsible for assessing your residual functional capacity").

Social Security Ruling 96-8p instructs that the ALJ's RFC assessment must be

based on all of the relevant evidence in the case record, including factors such as medical

history, medical signs and laboratory findings, the effects of treatment, daily activities,

lay evidence, recorded observations, medical source statements, effects of symptoms, and

evidence from attempts to work.

20 C.F.R. § 404.1527(d)(2) also explains that "[a]lthough we consider opinions

from medical sources on issues such as your RFC, . . . the final responsibility for deciding

these issues is reserved to the Commissioner."  The regulations do not require an ALJ to

rely solely upon medical opinions when formulating a RFC, but instead explicitly require

an ALJ to evaluate medical opinions based on their consistency with and support from

"medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. §

404.1527(c)(2), (3), (4).  Indeed, as the Sixth Circuit has held, physician opinions "are

only accorded great weight when they are supported by sufficient clinical findings and are

consistent with the evidence." *Cutlip v. Sec'y of Health & Human Servs.,* 25 F.3d 284,

287 (6th Cir. 1994).

The ALJ here gave "great weight" to medical opinion evidence from Drs. R. Kevin

Goeke, Ph.D. and Mel Zwissler, Ph.D., state agency reviewing psychologists, who

completed MRFC assessments in October 2009 and July 2010.  (*PageID##* 420-37, 575).

After review of Plaintiff's medical record on October 7, 2009, Dr. Goeke found Plaintiff had a moderate restriction in her daily activities; moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace; and no episodes of decompensation.  (*PageID#* 430).  When completing the MRFC, he determined that Plaintiff was moderately impaired in her ability to understand, remember, and carry out detailed instructions; maintain attention and concentration; perform activities within a schedule; maintain regular attendance, and be punctual within customary tolerances; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the working setting. (*PageID##* 434-35).  Dr. Goeke concluded that she could relate on a superficial basis and could interact with others on a superficial and occasional basis.  She could understand, remember, and carry out simple and some multi-step tasks.  She needed no strict production quotas and fast-paced environment.  (*PageID#* 437).

On July 10, 2010, Dr. Zwissler reviewed Plaintiff's record upon reconsideration and affirmed Dr. Goeke's assessment.  (*PageID#* 575).

The ALJ accepted Dr. Goeke's opinion that Plaintiff can understand, remember and carry out simple and some multi-step tasks, interact with others occasionally or

superficially and deal with common changes in a familiar work setting.  She cannot have strict production quotas or fast-paced production environments.  (*PageID#* 85).  The ALJ accommodated this opinion with her general restriction for "simple work in light of her pain, syncope, nausea and other physical symptoms-which are not typically assessed in the DDS mental residual functional capacity analyses."  (*PageID#* 86).

The Social Security regulations and rulings expressly recognize that state agency psychologists are "highly qualified psychologists who are also experts in Social Security disability evaluation."  *See* 20 C.F.R. § 404.1527(e)(2)(i); Social Security Ruling 96-6p; *see Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 651 (6th Cir. 2006) (en banc) (affirming ALJ's decision adopting reviewing physician's opinion over treating physician's opinion).

The ALJ also considered Plaintiff's subjective complaints in evaluating her RFC, but found they were not entirely credible.  (*PageID#* 85).  The Sixth Circuit has held that it accords great deference to an ALJ's credibility assessment, particularly because the ALJ has the opportunity to observe the demeanor of a witness while testifying.  *Jones v. Comm'r of Soc. Sec.,* 336 F.3d 469, 476 (6th Cir. 2003).  The ALJ expressly stated that she had considered Plaintiff's subjective complaints in accordance with the requirements of Social Security Ruling 96-4p, 96-7p, and 20 C.F.R. §§ 404.1529 and 416.929 (*PageID#* 82), and set forth the various factors that she had considered in her credibility assessment, including specific citations to medical records and medical source opinions,

objective clinical findings, treatment regimen, medication use, Plaintiff's narcotic abuse, observations at the hearing, and activities. (*PageID##* 82-87).

Turning next to Plaintiff's argument concerning the weight assigned to the medical source opinion of Donald Kramer, Ph.D. Plaintiff contends that the ALJ erred by inappropriately discounting the opinion of consulting examiner, Dr. Kramer. (Doc. 9, *PageID##* 1374-75).

Dr. Kramer interviewed and evaluated Plaintiff on August 27, 2009, on behalf of the Ohio BDD. (*PageID##* 399-406). Plaintiff reported to Dr. Kramer that she was raped at age sixteen and that she had flashbacks of the attack, which triggered panic attacks. Plaintiff also reported that as a child she was avoidant and socially anxious. (*PageID#* 400). She had a heart condition since a child and it caused her to pass out. It also caused panic attacks and anxiety and made her not to be around other children. She stated she dropped out of college because of her panic attacks and agoraphobia. (*Id.*). Plaintiff also reported that she could not afford counseling. Dr. Kramer observed that Plaintiff presented as very anxious and appeared to be "very shy, timid, and insecure with some psychomotor agitation and restlessness…." (*PageID#* 401). Dr. Kramer noted that Plaintiff "often had to be refocused and questions had to be re-asked of her." (*Id.*). Her social skills were weak. He stated, "[S]he comes across as a woman with significant symptoms of posttraumatic stress disorder, panic attacks with agoraphobia, as well as some dissociative experiences." (*Id.*). Dr. Kramer found her affect was depressed and concentration and focus were poor. (*PageID#* 402). He opined, "At the present time, the

20

claimant does not appear to possess the necessary insight or judgment to live independently, to make decisions regarding her future, or to manage her own funds." (*PageID#* 403).  He diagnosed Plaintiff with panic disorder with agoraphobia, PTSD, dissociative disorder NOS, major depression, and avoidant personality disorder. (*PageID#* 405).  Dr. Kramer opined that Plaintiff was extremely impaired in her abilities to relate to others and to withstand the stress and pressures associated with day-to-day work activity; and markedly impaired in her abilities to understand, remember, and follow instructions and to maintain concentration, persistence, and pace.  (*PageID##* 405-06). Dr. Kramer concluded that Plaintiff cannot perform even simple and repetitive tasks, but has the potential with appropriate treatment to function at a higher level.  (*Id.*).

When determining whether an ALJ acted properly in disagreeing with a medical source, the Court must first determine the medical source's classification.  Of the three types of medical sources – nonexamining sources, nontreating (but examining) sources, and treating sources – Dr. Kramer was the second.  *See* 20 C.F.R. § 404.1502; *Smith v. Comm'r of Soc. Sec.,* 482 F.3d 873, 875 (6th Cir. 2007) ("A 'nontreating source' (but examining source) has examined the claimant 'but does not have, or did not have, an ongoing treatment relationship with' [her].").  In contrast, Drs. Goeke and Zwissler were "nonexamining sources." *See Smith,* 482 F.3d at 875 ("A 'nonexamining source' is 'a physician, psychologist, or other acceptable medical source who has not examined [the claimant] but provides a medical or other opinion in [the claimant's] case.'").

21

The Social Security Administration gives the most weight to opinions from a claimant's treating source; accordingly, an ALJ is procedurally required to "give good reasons in [its] notice of determination or decision for the weight [it gives the claimant's] treating source's opinion." (*Id.*).  However, this requirement only applies to *treating* sources. (*Id.* at 876).  With regard to nontreating – but examining – sources, the agency will simply "[g]enerally [ ] give more weight to the opinion of a source who has examined [the claimant] than to the opinion of a source who has not examined [the claimant]." 20 C.F.R. § 404.1527(c)(1); *see also Smith,* 482 F.3d at 875.  Because Dr. Kramer should not have been afforded controlling weight, in order to determine how much weight to give Dr. Kramer's opinion, the ALJ must weigh his opinion with the factors – supportability, consistency, specialization, etc. – described in 20 C.F.R. § 404.1527(c).

The ALJ gave little weight to Dr. Kramer's opinion, determining that even though he found an extreme restriction in social functioning, Plaintiff was not then on any medication or undergoing any treatment for anxiety or her other mental impairments. (*PageID#* 81).  Likewise, the ALJ found that Dr. Kramer noted that Plaintiff has the potential to function at a high level with appropriate treatment – treatment that started the next year with Dr. Singh.  During this treatment, Plaintiff's symptoms improved. (*Id.*). The ALJ cited the absence in the record of other evidence that Plaintiff lacked the mental ability to perform any work activity.  The ALJ noted that Plaintiff had not received any mental health treatment, nor had she been on any medication. (*Id.*).  The record shows that the ALJ considered relevant factors in its determination to credit Drs. Goeke and

22

Zwissler's assessments over Dr. Kramer's.  The ALJ agreed with Dr. Goeke who found Plaintiff was limited to only occasional interactions with others.  (*PageID##* 85-86 citing to *PageID#* 436).

The record indicates Plaintiff arguably had no treating psychologist or psychiatrist that offered an opinion as to her limitations.[7]  Dr. Kramer opined that Plaintiff has the potential with appropriate treatment to function at a higher level, which based on records from Dr. Darshan Singh at Advanced Therapeutic Services and/or the Wellness Center, did occur as Plaintiff's symptoms improved.  (*PageID##* 572-74, 1105-25).  As there was no medical source with a longitudinal picture of Plaintiff's mental health, each psychological medical source opinion was necessarily based only on a limited amount of evidence.  Consequently, the Court does not find that the ALJ erred in her evaluation of the medical evidence or in her determination of Plaintiff's MRFC.  The ALJ's decision to place more weight on the conclusions of Drs. Goeke and Zwissler than that of Dr. Kramer is therefore supported by substantial evidence.

## IT IS THEREFORE RECOMMENDED THAT:

1. The Commissioner's non-disability determination be affirmed; and

2. The case be terminated on the docket of this Court.

January 21, 2015

      s/Sharon L. Ovington      
Sharon L. Ovington
Chief United States Magistrate Judge

---

[7]Plaintiff treated with Dr. Darshan Singh at Advanced Therapeutic Services and/or the Wellness Center from March 2010 until January 2011, with a gap of treatment due to Plaintiff having a child.  Dr. Singh offered no assessment of Plaintiff.  (*PageID#* 572-74, 1105-25).

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(d), this period is extended to **SEVENTEEN** days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474  U.S. 140 (1985);  *United States v. Walters*, 638 F. 2d 947, 949-50 (6th Cir. 1981).